1

2

3

4

5              **UNITED STATES DISTRICT COURT**

6                     **DISTRICT OF NEVADA**

7

8    SALVATORE H. VITALE, IV,                    )
                                                 )
9                          Plaintiff,            )    Case No. 2:12-cv-02010-JCM-GWF
                                                 )
10   vs.                                         )    **FINDINGS AND**
                                                 )    **RECOMMENDATION**
11   SOCIAL SECURITY ADMINISTRATION,             )
                                                 )
12                         Defendant.            )
     _____)

13

14          This matter is before the Court on Plaintiff Salvatore H. Vitale, IV's Complaint to Set Aside

15   the Final Order of the Commissioner of Social Security (#1).  Plaintiff filed his Motion for Remand

16   (#19) on June 19, 2013.  The Acting Commissioner filed her Opposition to Plaintiff's Motion for

17   Remand and Cross-Motion to Affirm the Agency's Decision (#20) on July 19, 2013 and Plaintiff

18   filed his Reply Brief (#25) on October 17, 2013.

19                          **BACKGROUND**

20        **A.    Procedural History.**

21          Plaintiff filed an application for a period of disability, disability insurance benefits and

22   supplemental social security income in August and November 2009, alleging that he became

23   disabled beginning December 18, 2008.  *See* Administrative Record ("AR") 101-114.  The

24   Commissioner denied Plaintiff's application initially on March 5, 2010, and upon reconsideration

25   on June 17, 2010.  AR 55-62, 67-72.  Plaintiff requested a hearing before an Administrative Law

26   Judge ("ALJ").  AR 73-74.  The hearing was conducted on June 24, 2011.  AR 33-50.  The ALJ

27   issued his decision on July 8, 2011 and concluded that Plaintiff was not disabled from December

28   15, 2008 through the date of the decision.  AR 19-26.  Plaintiff's request for review by the Appeals

Council was denied on September 17, 2012.  AR 1-4.  Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g), which has been referred to the undersigned magistrate judge for a report of findings and recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

### B.  Factual Background.

Plaintiff Salvatore H. Vitale, IV (hereinafter "Plaintiff" or "Vitale") was born on February 26, 1982.  He graduated from high school and also completed a computer technical school.  AR 36, 249.  Plaintiff's previous employment included work as a laborer doing home remodeling and construction from 2004 to 2006, production assistant providing emergency restoration service from 2002 to 2006, and "sandwich artist" at a Subway sandwich shop from October 27, 2006 to December 15, 2008.  AR 141-150.  Mr. Vitale has never been married and has no children.  AR 36. He has resided primarily with his grandmother and her husband.  AR 38.  Plaintiff is 5'9" tall.  In November 2009, he weighed 278 pounds.  AR 127.  At the time of the hearing in June 2011, he stated that he weighed about 315 pounds.  AR 37.

In his November 17, 2009 Disability Report, Plaintiff stated that the following illnesses or conditions limit his ability to work:  Forgetfulness, loss of concentration, random muscle spasms, short term memory deficits, random thought process, occasional, acute sharp pains in the back of head, and muscle spasms in the fingers and eyes.  Plaintiff stated that he suffers from "depressive disorder calcification in the brain."  He stated that his condition has progressed moderately over the last few years, and will greatly worsen as he gets older.  AR 128.  Plaintiff stated these problems affect his ability to work because he has trouble remembering instructions and directions.  He loses track of time, has forgotten to wash his work uniforms and has misplaced other items needed to start his job.  Plaintiff also stated that he forgets to perform activities of daily living, such as eating, bathing, and paying bills.  He stated that he does not sleep much and his energy level fluctuates between highs and lows.  AR 128.

### 1.  Mental Health Treatment Records: September 2000 to October 2005.

The administrative record contains psychiatric treatment records for Mr. Vitale dating back to September 22, 2000 when he was 18 years old and residing in Pennsylvania.  AR 229-230.  On

that date, a psychiatrist provided the following diagnosis: Axis I: Major Depression with Psychotic

Features; Axis II: Schizoid Personality Traits; Axis III: Obesity, History of Hypertension, Axis IV:

Illness of his father, Past abuse; Axis V: GAF: 50.[1]  The psychiatrist recommended that Mr. Vitale

be treated for depression and other symptoms on an outpatient basis and that a CT scan of his head

be obtained due to his complaints of headaches.  The psychiatrist also prescribed Celexa and

discussed the possibility of prescribing anti-psychotic medications after more information and

testing was obtained.  AR 229.

On June 9, 2003, Plaintiff was seen for an initial psychiatric evaluation at Northeast

Counseling Services in Nanticoke, Pennsylvania.  AR 227-228.  His chief complaint was

depression.  The report noted that "[t]he patient has been involved in mental health services here

off and on since September 2000."  AR 227.  Plaintiff was taking Lexapro, 10 mg daily.  He

reported that he was doing well, but had a past history of depression, inappropriate behavior and

social isolation.  Id.  Under "Medical History," Plaintiff was noted to have "Anemia, thyroid

problems, calcification on his basal ganglia; he had an MRI [?] done in July of 2001 and apparently

---

[1] "GAF scores 'are used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults.'"  *Sweeney v. Commissioner of Social Sec.*, 847 F.Supp.2d 797, 802 (W.D.Pa. 2012), citing *Irizarry v. Barnhart,* 233 Fed.Appx. 189, 190 n. 1 (3d Cir. 2007).  "'The GAF scale, designed by the American Psychiatric Association, ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest.'" *Id.*, citing *West v. Astrue,* 2010 WL 1659712, at *4 (E.D.Pa. Apr. 26, 2010).  "An individual with a GAF score of 60 may have '[m]oderate symptoms' or 'moderate difficulty in social, occupational, or school functioning;' of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)' or 'impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);' of 40 may have '[s]ome impairment in reality testing or communication' or 'major impairment in several areas, such as work or school, family relations, judgment, thinking or mood'. . . ."  *Gallagher v. Astrue*, 2012 WL 2344455, at *10 n. 3 (W.D.Pa. 2012), citing *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV–TR) 34 (4th ed. 2000); *Bracciodieta–Nelson,* 782 F.Supp.2d 152, 157 (W.D.Pa. 2011)."

Despite its usefulness as a tool for psychological assessment, courts in the Ninth Circuit hold that a GAF score is not determinative of mental disability or limitation for social security purposes, and an ALJ is not bound to consider it in determining whether a claimant is disabled by a mental impairment.  *Hammons v. Colvin*, 2013 WL 5786092, at *10 (W.D.Wash. 2013), citing *McFarland v. Astrue,* 288 Fed. Appx. 357, 359 (9th Cir.2008) and *Orellana v. Astrue,* 2008 WL 398834, at *9 (E.D.Cal. Feb.12, 2008).  *See also Mann v. Astrue*, 2009 WL 2246350, at *1 (C.D.Cal. 2009) and *Thomas v. Astrue*, 2009 WL 141488, at *6 (C.D.Cal. 2009).  In this case, the ALJ considered Plaintiff's GAF scores of 65 to denote mild symptoms.

it was found to be normal." Id.   The report stated that Plaintiff was being followed by a Dr. Adler and was receiving Synthyroid medication.  Plaintiff also reported a history of high blood pressure. Id.

Under "Mental Status Examination," the psychiatrist stated:

> When seen, the patient is generally awake, alert and cooperative. Gait is fair. Personal hygiene is fair.  The patient is overweight. Speech is clear, coherent, relevant, spontaneous and productive. Reaction time is in the average range.  Anxiety level is moderate. Affect is guarded.  No suicidal intent, thoughts or plans.  No indication of any hallucinations.  Short term plans are questionable. Memory functioning is good. Retention and recall are fair.  Attention and concentration are fair.  Intellectual functioning needs to be evaluated further.  Orientation is good to time, place and person. Judgment and insight are questionable.  Reliability is fair.

AR 227.

The psychiatrist's diagnosis was as follows:  Axis I: Major Depression by history, Relationship problems, NOS; Axis II: Nothing; Axis III: As mentioned; Axis IV: Unspecified; Axis V: GAF: 40.  AR 228.  The psychiatrist recommended that Plaintiff's medication be monitored and that he receive counseling.  Id.

Mr. Vitale received treatment and counseling at Northeast Counseling Services through September 19, 2005.  AR 206-226.  The evaluation reports indicate that his mental condition improved during the initial months of therapy.  His GAF score, for example, improved from 40 on June 9, 2003 to 55 on October 22, 2003.  AR 221, 224, 226.  On December 3, 2003, the psychiatrist noted, however, that Plaintiff was not compliant with his treatment regimen and he had not been taking his medication appropriately.  AR 220.  His GAF score was 45.  AR 219.  Although Plaintiff continued to fail to take his medications regularly or to consistently attend counseling, his mental condition improved and he had a GAF score of 50 on January 7, 2004.  AR 218. This status continued through June 25, 2004.  AR 215.  Plaintiff also began performing renovation work and was seeking to move out of his grandmother's residence and establish greater independence.  AR 215.  From January 2004 through June 2005, Plaintiff's depression and anxiety levels varied.  His GAF scores ranged between 50 and 45.  AR 209-218.

. . .

4

Plaintiff's last psychiatric evaluation at Northeast Counseling Services occurred on September 19, 2005. Plaintiff reported that he had been having episodes of depression related to his medical condition. He was worried about some special tests that had been done. However, on consulting Dr. Adler, it was determined that Plaintiff was having his thyroid checked. Plaintiff was still concerned that he has calcification in his brain and wanted to go to a neurologist. The psychologist noted that "[c]urrently there are no major complications in the program reported and no reports of any agitation or aggressive behavior at home. His sleep is fair. The patient remains overweight." AR 206. Under "Mental Status Examination," the psychiatrist noted that "[m]emory functioning remains good. Retention and recall are good. Attention and concentration are fair. Intellectual functioning is probably unchanged since last seen. Orientation is good to time, place, and person. Judgment and insight are questionable. Reliability is fair." AR 206.

The Plaintiff was discharged from Northeast Counseling Services on October 19, 2005 because he was moving to Louisiana to work on flood relief efforts. AR 231. There are no records regarding Plaintiff's mental or physical health for the time period between October 19, 2005 and February 22, 2010.

### 2.    February 22, 2010 Mental Status Examination by Miles Morgan, Psy.D.

On February 22, 2010, Mr. Vitale was evaluated by Dr. Miles Morgan, psychologist, at the request of the Bureau of Disability Adjudication. AR 248. Mr. Vitale told Dr. Morgan that prior to 2006, he worked for a family construction business for five years. His job duties included general construction and cleaning. The business closed and Plaintiff moved with his family to Nevada in 2006. Plaintiff worked as a sandwich maker at a Subway sandwich shop for two years. He was fired due to memory problems and being late for work. He indicated that he did not correctly count money. After losing his job at Subway, Plaintiff returned to Pennsylvania, but could not find work there and returned to Nevada. He applied again at Subway, but was not rehired. Plaintiff had not applied for other employment because of his concerns about his cognitive functioning. AR 250.

Dr. Morgan performed a mental status examination of the Plaintiff. AR 250-254. Under the subsection of his report titled "Ability to Understand Instructions," Dr Morgan stated that Mr. Vitale "has the ability to understand a limited variety of complex instructions. He should have no

difficulty understanding detailed or simple instructions. He is estimated to function intellectually within an average range." AR 254. Under "Memory for Instructions," Dr. Morgan stated that Plaintiff had mild to moderate deficits with immediate and working memory. "He would be unable to remember complex instructions. He would likely struggle to recall detailed instructions as well but does report successfully using memory devices for assistance. He should be able to remember simple one or two step instructions without difficulty." Id. Under "Ability to Work on a Sustained Basis," Dr. Morgan stated:

> This claimant does report symptoms of depression but these are not at a level of severity that would prevent him from working on a full-time, sustained basis. This claimant indicates that he is primarily unable to work at this point due to cognitive deficits that are associated with idiopathic basal ganglia calcifications. This claimant will require medical evaluation and comment in regard to the extent of cognitive impairment and subsequent disability that this type of condition would be expected to create.

AR 255.

Dr. Morgan made the following diagnosis: Axis I:  Mood Disorder due to Familial Idiopathic Basal Ganglia Calcifications; Axis II: No diagnosis; Axis III:  Idiopathic Basal Ganglia Calcifications, obesity; Axis IV: Psychosocial Stressors: Economic, current living situation, occupational, lack of access to appropriate medical care. Axis V: Current GAF: 65.  GAF Past Year: 65.  AR 255.  Dr. Morgan stated that Plaintiff's "prognosis in regard to mental health issues is good assuming he is willing to access appropriate mental health care in the form of outpatient counseling and he does not experience any further reported declines with physical or cognitive functioning." AR 255.

**3.      State Agency Psychologist's Mental Residual Functional Capacity Assessment.**

On March 3, 2010, state agency psychologist Pastora Roldan, Ph.D. provided a rating of Plaintiff's functional limitations and an assessment of his mental residual functional capacity.  AR 256-273.  Dr. Roldan stated that Plaintiff had a medically determinable impairment of "Mood Disorder due to a General Medical Condition; Depressive. AR 259.  Under the "B" Criteria of the Listings, Dr. Roldan stated that Plaintiff had mild restriction of activities of daily living, no difficulties in maintaining social functioning, moderate difficulties in maintaining concentration,

persistence or pace, and no episodes of decompensation of extended duration.  AR 266.  The evidence did not establish the presence of "C" criteria.  AR 267.

In assessing Plaintiff's mental residual functional capacity, Dr. Roldan reported that he was not significantly limited in the ability to remember locations and work like procedures and to understand and remember very short and simple instructions.  He was moderately limited in the ability to understand and remember detailed instructions.  In regard to sustained concentration and persistence, Plaintiff was not significantly limited in the ability to carry out very short and simple instructions, but was moderately limited in the ability to carry out detailed instructions and to maintain attention and concentration for extended periods.  He was not significantly limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted; and to make simple work-related decisions.  AR 270.  Dr. Roldan also found that Plaintiff was not significantly limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  AR 271.

Dr. Roldan also found that Plaintiff was not significantly limited in social interaction.  Id.  Under "Adaption," she found that Plaintiff was not significantly limited in the ability to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to travel in unfamiliar places or use public transportation.  AR 271.  She found that he was moderately limited in the ability to set realistic goals or make plans independently of others.  AR 271.

**4.    State Agency Physician's Physical Mental Residual Functional Capacity Assessment.**

On June 13, 2010, State Agency physician Navdeep S. Dhaliwal, M.D. prepared a physical residual functional capacity assessment.  AR 298-305.  Dr. Dhaliwal's specific  findings regarding Plaintiff's physical residual functional capacity are not in dispute and the Court therefore does not set them forth herein.   Dr. Dhaliwal did note that the "[d]iagnosis of Idiopathic basal ganglia

7

1  calcification and problems from this is not clear in this case.  History of seizures is also not clear in

2  this case.  Suggest medium RFC in this case."  AR 305.

3       **5.**    **UMC Clinic Records.**

4       Plaintiff was seen at the University Medical Center (UMC), Lied Out-Patient Clinic on May

5  18, 2010.  AR 284-285.  He informed the clinic that he had been diagnosed with familial idiopathic

6  basal ganglia calcifications in 2001, and also had a history of thyroid problems.  Blood work and

7  urinalysis studies were obtained and the results were reported on May 26, 2010.  AR 286-289.

8  Plaintiff was seen in follow-up on July 15, 2010.  He informed the clinic physician, Dr. Selgestad,

9  that he had previously been "diagnosed with familial idiopathic ganglionic calcification, which is

10  allegedly a progressive brain disease."  AR 325.  Dr. Selgestad noted that "[t]he patient also had a

11  CT scan of the brain with and without contrast and that was normal."  AR 325.  He stated that

12  Plaintiff would be referred to neurology.  Id.  Dr. Selgestad reported on August 12, 2010, however,

13  that the neurology department declined to see the Plaintiff.  AR 322.

14       Plaintiff returned to the UMC clinic on January 21, 2011.  The clinic noted under "Past

15  Medical History," the following conditions: "2. Basal ganglion calcifications felt to be benign

16  based on neurological assessment.  3.  Short-term memory loss felt to be secondary to mood

17  disorder at this time."  Plaintiff was directed to follow-up with mental health for these problems.

18  AR 319.

19       **6.**    **Southern Nevada Adult Mental Health Services ("SNAMHS") Clinic.**

20       Mr. Vitale was initially seen at the SNAMHS clinic on May 26, 2010.  AR 291.  The nurse

21  noted that he was alert and oriented, had good eye contact, logical thought and an appropriate

22  affect.  Plaintiff underwent a psychiatric evaluation on August 11, 2010.  AR 293.  He reported

23  increased difficulty with memory, "slow thinking" and low self-esteem.  Id.  He stated that he had

24  undergone a CT brain scan eight years ago and was diagnosed with Familial Idiopathic Basal

25  Ganglia Calcifications.  He stated that this was a degenerative brain disease "like dementia."  The

26  SNAMHS psychologist performed a mental status examination.  AR 294-295.  He noted that

27  Plaintiff was appropriately groomed and dressed, and was polite and cooperative.  Plaintiff's

28  speech was slow and mildly dysarthric.  His mood was slightly depressed and his affect was

1  restricted.  Plaintiff's memory was "5/5 immed. 1/5@ 5 min. (grossly impaired); no improvement
2  with prompt."  AR 295.  Plaintiff's general fund of knowledge and of current events was good.  He
3  had no evident problems with naming objects.  He followed 3-step commands correctly.  He made
4  errors on serial 3 subtraction and could not successfully recite the days of week in reverse.  The
5  psychologist gave Plaintiff a current GAF score of 57 with a twelve month high score of 57.  The
6  psychologist prescribed a trial of Pristiq 50 mg, Rozerem and recommended that Plaintiff attend
7  group therapy.  AR 296.

8       Plaintiff was seen in follow-up on September 22, 2010.  He  reported that his current
9  medications were effective and his grandmother had observed improvement in him.  His mood was
10 better and his affect was appropriate.  On December 9, 2010, Plaintiff reported that the medications
11 had been helpful.  He denied any sustained depressive feelings and did not complain of side effects.
12 He also reported that he was sleeping 8 hours a night.  On March 4, 2011, Plaintiff reported a
13 positive response to the Pristiq medication, but still had residual low motivation/interests, social
14 isolation (decreased) and low physical energy.  He reported that he was sleeping well.  The record
15 also indicated chronic poor short-term memory.  AR 312.

16      On May 17, 2011, Plaintiff reported that he "continued to be essentially free of
17 depressive/anxiety [symptoms]."  AR 308.  He was sleeping fairly well and his medical condition
18 appeared stable.  Under "Mental Status Exam," Plaintiff was noted to be alert to time and place,
19 and had good eye contact.  His mood was good and his affect was appropriate.  Plaintiff's speech
20 was "mildly dystharthric/slow (chronic)."  His thought process was linear.  Cognitive functioning
21 was grossly intact based on history/presentation, but he still had short-term memory impairment
22 which was chronic.  Plaintiff had good insight and judgment.  AR 308.

23      **7.      Function Reports and Plaintiff's Hearing Testimony.**

24      Mr. Vitale completed a Social Security Function Report on January 4, 2010.  AR 159-168.
25 He stated that his daily activities included playing games, watching television, performing
26 household chores, going for car rides, and going to his aunt's house to play with her dogs.  AR 159.
27 He stated that he had difficulties staying on task, keeping a schedule and not being dependent on
28 others.  He reported poor sleep.  He would forget to do laundry, and would also forget to perform

9

personal hygiene tasks such as showering and shaving.  He also needed reminders to take

medication.  AR 160.  Plaintiff indicated that he does some cooking and house and yard work, but

again indicated that he would get sidetracked doing these activities and would need reminders to

complete them.  AR 161.  He went shopping once a month.  He stated that he was not able to pay

bills, count change, or handle a savings book, checking account or money orders.  AR 162.  Under

social activities, he stated that he communicates with friends on-line on a daily basis.  He goes to

Wal-Mart, the grocery store, casinos, buffets and his aunt's house on a regular basis.  AR 163.

Under the section of the report concerning abilities, Plaintiff emphasized his problems with short-

term memory loss, forgetfulness and difficulty following instructions.

Mr. Vitale's aunt, Kimberly Vincent, also completed a Function Report on January 1, 2010

that provided information about Mr. Vitale's activities of daily living and limitations that was

consistent with that provided in Plaintiff's report.  AR 151-158

Mr. Vitale's testimony during the June 24, 2011 hearing regarding his activities of daily

living and mental limitations was generally consistent with the information contained in his

Function Report.  In response to the ALJ's question as why he cannot work, Mr. Vitale testified:

> But with my condition that I have, my memory is getting worse that I
> feel -- my short-term memory and I forget to do a lot of important
> things that's required of jobs like my last job, for instance, was at
> Subway and I was required to handle money and do food counts and
> stuff like that and towards the end of when I stopped working, things
> were getting very tough that I would forget the store keys, I would
> misplace them, the safe would be short of money, and things of that
> nature.

AR 42.

Mr. Vitale testified that the prior manager had been sympathetic to his mental problems and

covered for him.  AR 45.  The second manager, however, was not sympathetic and told him that he

would have to pay back the money lost in the cash shortage.  He therefore quit.  Id.

**8.      Vocational Expert's Testimony.**

Vocational expert Kourtney Layton testified at the June 24, 2011 hearing.  The ALJ asked

Ms. Layton the following question:

. . .

1

2

3

4

   Q.  I'll hypothecate a person of claimant's age, education and past work experience at the medium level; only occasionally climbing ropes, ladders, or scaffolding; no concentrated exposure to hazards by which I mean unprotected heights and dangerous machinery; no driving; he said he doesn't have a license because he couldn't pass the test basically; and in the mental realm there will be four moderate limits.

5

   ALJ: 4F[2], counsel.

6

   BY THE ADMINISTRATIVE LAW JUDGE:

7

   Q.  A3, B5, B6, and D as in dog 20.  Take the time you need to digest all of those and I'll ask you some of the usual questions.

8

9

   A.  I'm ready, Your Honor.

10

   Q.  Any of the past work available for such a person?

11

   A.  Yes, Your Honor, one job.

12

   Q.  All right. Which one?

13

   A.  That is sandwich maker, 317.664-014; medium; SVP of 2.

14

   Q.  Okay.

15

AR 47-48.

16

  The ALJ then turned to Plaintiff's legal representative to see if she wished to question the

17

vocational expert.  The legal representative appeared somewhat confused as to whether the ALJ

18

had asked a hypothetical question.  The legal representative then asked the vocational expert

19

whether Plaintiff could perform his past relevant work.  AR 48-49.  The vocational expert

20

responded: "Just for the job of sandwich maker."  AR 49.  The legal representative asked if the

21

hypothetical person would be able to perform that job, or any other work, if he "would be off task

22

for simple and repetitive tasks 40% percent of the time."  The vocational expert responded no.  AR

23

49.

24

  **C.**  **Administrative Law Judge's July 8, 2011 Decision.**

25

  The ALJ applied the five-step sequential evaluation process established by the Social

26

Security Administration in determining whether Plaintiff was disabled.  At step one, the ALJ found

27

28

_____

[2] Exhibit 4F was Dr. Roldan's March 3, 2010 Mental Residual Functional Capacity Assessment.

1   that Plaintiff met the insured status requirements of the Social Security Act through December 31,

2   2009 and that Plaintiff had not engaged in substantial gainful activity since December 15, 2008, the

3   alleged onset date of his disability.  AR 19.  At step two, the ALJ found that Plaintiff had the

4   following severe impairments:   Familial idiopathic ganglia calcifications with secondary onset of

5   short-term memory deficits, major depressive disorder, and obesity (20 CFR 404.1520(c) and

6   416.920(c)).  AR 21.

7        At step three, the ALJ found that Plaintiff did not have an impairment or combination of

8   impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404,

9   Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and

10  416.926).  AR 22.  In support of this finding, the ALJ relied on the mental residual functional

11  capacity assessment prepared by Dr. Roldan, the findings of which are set forth in the ALJ's

12  decision.  AR 22-23.  The ALJ also considered Plaintiff's obesity, which fell into the category of

13  morbid obesity in conjunction with his other severe impairments.  Id.

14       Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to

15  perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), including lifting up to 50

16  pounds occasionally, 25 pounds frequently, standing and/or walking up to 6 hours in an 8-hour

17  workday, with the following restrictions: Plaintiff can occasionally climb ladders/ropes/scaffolds,

18  should avoid concentrated exposure to hazardous machinery, heights, and is precluded from

19  driving.  The ALJ further found that Plaintiff "would have moderate limitations in the ability to

20  understand, remember and carry out detailed instructions, maintain attention and concentration for

21  extended periods, and set realistic goals or make plans independent of others."  AR 23.

22       The ALJ considered Plaintiff's disability reports and hearing testimony regarding the

23  severity of his mental symptoms and limitations, but concluded that "the claimant's statements

24  concerning the intensity, persistence and limiting effects of these symptoms are not credible to the

25  extent they are inconsistent with the above residual functional capacity assessment."  AR 23-24.

26  The ALJ reviewed Dr. Morgan's psychological evaluation report and the mental health and medical

27  treatment records.  AR 24-25.  The ALJ concluded that the "course of medical treatment in this

28  case does not bolster claimant's credibility with respect to his degree of pain and other subject

12

complaints." AR 25.  He stated that the Plaintiff had not received the type of medical or mental health treatment one would expect for a totally disabled individual.  He further noted that Plaintiff's symptoms improved with medications.  The ALJ also noted that despite his short term memory problems, Plaintiff had fairly full activities of daily living. "He checks e-mail and internet sites that involve social networking, talks to individuals online, plays games on computer, watches television; does household chores including taking out the [garbage], loading the dishwasher, vacuuming, pulling weed, helping cook and complete his laundry." AR 25.

The ALJ also noted Kimberly Vincent's function report, but did not attribute significant weight to her opinions regarding Plaintiff's condition because the description of Plaintiff's limitations was not supported by the medical records.  AR 25.  The ALJ gave substantial weight to the opinion of the State Agency review physician, Dr. Dhaliwal.  AR 26.

At step four, the ALJ found that Plaintiff is capable of performing his past relevant work as a sandwich maker.  In so finding, the ALJ stated that "[u]sing the Dictionary of Occupational Titles as a reference, the vocational expert testified that the claimant's past work as a sandwich maker (DOT 314.664-014) which is unskilled work, performed at the medium level of physical exertion. Based on the residual functional capacity of a reduced range of medium work the claimant is able to perform his past relevant work (vocational expert testimony).  Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the DOT."  AR 26.

The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from December 15, 2008 through the date of the decision (20 CFR 404.1520(f) and 416.920(f)).  AR 26.

## DISCUSSION

### I.      Standard of Review

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

1   might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal.

2   2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*,

3   236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both

4   adverse and supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the

5   factual findings of the Commissioner of Social Security are supported by substantial evidence, the

6   District Court must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence

7   may be open to more than one rational interpretation, the Court is required to uphold the decision.

8   *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450,

9   1453 (9th Cir. 1984)).  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court

10  may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal

11  or affirmation of the ALJ's decision.  *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453,

12  1457 (9th Cir. 1995).

13          It is incumbent on the ALJ to make specific findings so that the court need not speculate as

14  to the findings.  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981), citing *Baerga v.*

15  *Richardson*, 500 F.2d 309 (3rd Cir. 1974).  In order to enable the court to properly determine

16  whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings

17  "should be as comprehensive and analytical as feasible and, where appropriate, should include a

18  statement of subordinate factual foundations on which the ultimate factual conclusions are based."

19  *Lewin*, 654 F.2d at 635.

20          In reviewing the administrative decision, the District Court has the power to enter "a

21  judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

22  with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In the alternative, the

23  District Court "may at any time order additional evidence to be taken before the Commissioner of

24  Social Security, but only upon a showing that there is new evidence which is material and that there

25  is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  *Id.*

26          **II.     Disability Evaluation Process**

27          To qualify for disability benefits under the Social Security Act, a claimant must show that:

28  (a) he/she suffers from a medically determinable physical or mental impairment that can be

14

1    expected to result in death or that has lasted or can be expected to last for a continuous period of
2    not less that twelve months; and (b) the impairment renders the claimant incapable of performing
3    the work that the claimant previously performed and incapable of performing any other substantial
4    gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th
5    Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving
6    disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122
7    (1996).  If the claimant establishes an inability to perform his or her prior work, the burden shifts to
8    the Commissioner to show that the claimant can perform a significant number of other jobs that
9    exist in the national economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007).

10         Social Security disability claims are evaluated under a five-step sequential evaluation
11   procedure.  *See* 20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir.
12   2001).  The claimant carries the burden with respect to steps one through four.  *Tackett v. Apfel*,
13   180 F.3d 1094, 1098 (9th Cir. 1999).  If a claimant is found to be disabled, or not disabled, at any
14   point during the process, then no further assessment is necessary.  20 C.F.R. § 404.1520(a).  Under
15   the first step, the Secretary determines whether a claimant is currently engaged in substantial
16   gainful activity.  *Id.* § 416.920(b).  If so, the claimant is not considered disabled.  *Id.* § 404.1520(b).
17   Second, the Secretary determines whether the claimant's impairment is severe.  *Id.* § 416.920(c).  If
18   the impairment is not severe, the claimant is not considered disabled.  *Id*. § 404.152(c).  Third, the
19   claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt.
20   P, App. 1.  The claimant will be found disabled if the claimant's impairment meets or equals a
21   listed impairment.  *Id.* § 404.1520(d).  If a listed impairment is not met or equaled, the fourth
22   inquiry is whether the claimant can perform past relevant work.  *Id*. § 416.920(e).  If the claimant
23   can engage in past relevant work, then no disability exists.  *Id.* § 404.1520(e).  If the claimant
24   cannot perform past relevant work, the Secretary has the burden of proof at the fifth and final step
25   to demonstrate that the claimant is able to perform other kinds of work.  *Id.* § 404.1520(f).  If the
26   Secretary cannot meet his or her burden, the claimant is entitled to disability benefits.  *Id.* §
27   404.1520(a).
28   . . .

1

   **III.**  **Whether the ALJ Erred at Step Four of the Sequential Process.**

2

   Plaintiff asserts that he suffers from familial idiopathic basal ganglia calcification which is

3

"a rare progressive brain disorder." *Motion to Remand (#19), pg. 5.*  Plaintiff further states that the

4

medical records show that he started receiving treatment for this condition in September 2000. *Id.*

5

In fact, there are no medical reports in the administrative record showing that Plaintiff was actually

6

diagnosed with familial idiopathic basal ganglia calcification prior to 2010 or that he was

7

experiencing cognitive problems as a result of this alleged disorder.  Plaintiff informed the

8

Northeast Counseling Services psychiatrists who evaluated and treated him that he had been

9

diagnosed with this condition.  The psychiatrists did not dispute this alleged diagnosis.  It appears,

10

however, that they treated Plaintiff for depression and mood disorder, and not for a diagnosed

11

condition of idiopathic basal ganglia calcification.

12

   In 2010, Plaintiff also informed the UMC clinic and the SNAMHS clinic that he suffered

13

from familial idiopathic basal ganglia calcification.  The UMC clinic physician noted, however,

14

that Plaintiff had a CT scan of the brain which was normal.  AR 325.  Another UMC clinic

15

physician reported that Plaintiff's basal ganglion calcifications were felt to be benign based on

16

neurological assessment.  AR 319.  Dr. Dhaliwal also noted that the diagnosis of idiopathic basal

17

ganglia calcification and problems associated with the condition was not clear.  AR 305.  Again, it

18

does not appear that Plaintiff received any specific treatment for this alleged condition.  The

19

medication treatment that he received from the SNAMHS clinic, however, appeared to result in the

20

improvement of his depression and related symptoms.  The ALJ, in any event, listed familial

21

idiopathic basal ganglia calcification as a severe impairment at step two of the sequential process.

22

AR 21.

23

   Plaintiff argues that the medical records, together with his own statements and testimony

24

regarding the severity of his cognitive problems, support the conclusion that he is unable to work.

25

None of the physicians who examined or treated Plaintiff, except for Dr. Morgan, rendered

26

opinions about his mental capacity to perform work related tasks.  As noted, the Northeast

27

Counseling Services and the SNAMHS clinic records show that Plaintiff's depression and other

28

mental symptoms improved with treatment.  It also appears that his condition deteriorated to some

extent when he went without treatment or failed to follow it on a regular basis.  There are no medical opinions in the record that conflict with Dr. Morgan's findings regarding Plaintiff's ability to perform work related tasks.  Dr. Roldan's mental residual functional capacity assessment also appears to be consistent with Dr. Morgan's findings.

Plaintiff, at least indirectly, attacks the ALJ's decision on the grounds that he did not provide adequate reasons for rejecting the credibility of Plaintiff's statements and testimony regarding the severity of his cognitive problems.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (2009) states that in the absence of affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing.  The ALJ must cite the reasons why the claimant's testimony is unpersuasive.  He must also specifically identify what testimony is credible and what evidence undermines the claimant's complaints.  Questions of credibility and resolutions of conflicts in the testimony are functions solely for the Commissioner.  *See also Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F. 3d 595, 599 (9th Cir. 1999).

The ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the severity of pain.  *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) and *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 884-85 (9th Cir. 2006).  He must, instead, identify other evidence in the record that supports the conclusion that the claimant's testimony is not credible.  Here, the ALJ referenced not only the medical evidence regarding Plaintiff's mental impairments, he also referenced Plaintiff's ability to engage in the various activities of daily living, including using the computer to play games and communicate with others, which the ALJ found to be inconsistent with Plaintiff's statements regarding the severity of his cognitive limitations, in particular, short-term memory loss.  The ALJ's credibility finding is therefore reasonably supported by the specific evidence cited in his decision.

Plaintiff's principal attack on the ALJ's decision is based on the argument that the ALJ failed to present a proper hypothetical question to the vocational expert which included, on the record, all of the limitations or assumptions that the vocational expert was asked to consider in testifying whether the claimant was capable of performing his past relevant work.  In support of his

17

1  argument, Plaintiff cites "HALLEX 1-2-555." *Motion to Remand (#19), pg. 9.* HALLEX is the

2  acronym for the Social Security Administration's "Hearings, Appeals and Litigation Law Manual."

3  Section 1-2-5-55 of that manual states: "If certain VE testimony is based on an assumption, the VE

4  or ALJ must clearly describe the assumption on the record."

5        The HALLEX is not binding on the court, but may be looked to for guidance on particular

6  matters addressed in the manual. *Bowie v. Commissioner of Social Sec.*, 539 F.3d 395, 399 (6th

7  Cir. 2008), *Turner v. Astrue*, 2011 WL 2783832, *4 (S.D.Ohio 2011). *See also Melvin v. Astrue*,

8  602 F.Supp.2d 694, 704 (E.D.N.C. 2009) (HALLEX is an internal guidance tool which lacks the

9  force of law). The statement in Section 1-2-5-55 that the assumptions upon which the vocational

10  expert's opinion is based must be clearly described on the record, is consistent with Ninth Circuit

11  case law. In this regard, *Hill v. Astrue*, 698 F.3d 1153, 1161-62 (9th Cir. 2012) states as follows:

12          The ALJ may meet his burden at step five by asking a vocational
        expert a hypothetical question based on medical assumptions

13          supported by substantial evidence in the record and reflecting all the
        claimant's limitations, both physical and mental, supported by the

14          record. *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685,
        690 (9th Cir. 2009); *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir.

15          2002); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573,
        578 (9th Cir. 1988) (Pregerson, J., concurring) ("The ALJ's depiction

16          of the claimant's disability must be accurate, detailed, and supported
        by the medical record."). "If a vocational expert's hypothetical does

17          not reflect all of the claimant's limitations, then the expert's
        testimony has no evidentiary value to support a finding that the

18          claimant can adequately perform jobs in the national economy."
        *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993) (internal

19          quotation marks and citations omitted).

20       *See also Gamer v. Secretary of Health and Human Services*, 815 F.2d 1275, 1279 (9th Cir.

21  1987) ("Hypothetical questions asked of vocational experts must 'set out all of the claimant's

22  impairments.'"); *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (same); and *Tackett v.*

23  *Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1094) (same). The same requirements should also apply

24  where the ALJ relies on vocational expert testimony at step four of the sequential process to

25  conclude that Plaintiff can perform her past relevant work. The Ninth Circuit has also held,

26  pursuant to SSR 00-4p, that the ALJ has an affirmative responsibility to ask the vocational expert if

27  the evidence he or she has provided is consistent with the *Dictionary of Occupational Titles* and

28  . . .

1    obtain a reasonable explanation of any apparent conflict. *Massachi v. Astrue*, 486 F.3d 1149, 1152-
2    53 (9th Cir. 2007).

3         In this case, the ALJ asked the vocational expert to assume a person of Plaintiff's age,
4    education and past work experience at the medium level, who would be limited in climbing, not
5    exposed to hazards such as unprotected heights and dangerous machinery, and who does not drive.
6    AR 47.  The ALJ further stated: "and in the mental health realm there will be four moderate limits."
7    Id.  The ALJ then referred the vocational expert to certain hearing exhibits and requested that she
8    review them.  AR 47-48.  After apparently completing her review, the vocational expert testified
9    that Plaintiff would be able to perform his past work as a sandwich maker, which has a Dictionary
10   of Occupational Titles (DOT) code number of 37.664.-014.  Id.  Neither the ALJ, nor the
11   vocational expert, described on the record the four moderate limits "in the mental health realm"
12   that applied to Plaintiff's ability to perform medium work.

13        It might be possible to infer from a review of the exhibits referenced by the ALJ, what
14   moderate limitations the ALJ intended to apply to Plaintiff's ability to perform medium level work.
15   The ALJ stated in his subsequent decision, for example, that Plaintiff "would have moderate
16   limitations in the ability to understand, remember, and carry out detailed instructions, maintain
17   attention and concentration for extended periods, and set realistic goals or make plans
18   independently of others."  AR 23.   It is speculation, however, to conclude that the vocational
19   expert recognized the same limitations intended by the ALJ and incorporated those limitations into
20   her answer.  Because Ninth Circuit case law clearly requires that all impairments or limitations on
21   the Plaintiff's ability to work be set out in the hypothetical question, the vocational expert
22   testimony in this case cannot be relied upon to support the ALJ's conclusion that Plaintiff can
23   perform his past work as a sandwich maker.

24                                     **CONCLUSION**

25        *Hill v. Astrue* states that "[r]emand for further proceedings is appropriate where there are
26   outstanding issues that must be resolved before a determination can be made, and it is not clear
27   from the record that the ALJ would be required to find the claimant disabled if all of the evidence
28   were properly evaluated."  698 F.3d at 1162.  In this case, vocational expert testimony, based on a

properly posed hypothetical question, may still establish that Plaintiff is able to perform his past relevant work or is able to perform other work available in the national economy. The appropriate remedy, therefore, is to remand this case for a further hearing to obtain vocational expert testimony regarding Plaintiff's ability to work that is based on a proper hypothetical question which clearly sets forth on the record all of the Plaintiff's physical or mental impairments or limitations. Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Remand (#19) be **granted**, and that this matter be remanded to the Social Security Administration for a further hearing and proper vocational expert testimony as to whether Plaintiff is able to perform his past relevant work.

**IT IS FURTHER RECOMMENDED** that the Acting Commissioner's Cross-Motion to Affirm the Agency's Decision (#20) be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 13th day of February, 2014.

GEORGE FOLEY, JR.
United States Magistrate Judge

20